UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-10005-CR-MARTINEZ/SNOW

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

NELSON ATWOOD SAWYER,

    Defendant.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant, **Nelson Atwood Sawyer's** Motion to Suppress Physical Evidence Related to the Traffic Stop Giving Rise to Mr. Sawyer's Arrest and Indictment Herein, as well as Mr. Sawyer's Unmirandized Statements Made After Being Placed in Custody During the Same Traffic Stop (ECF No. 21) and Motion to Dismiss the Indictment [D.E. 1] on Grounds of Government Misconduct (ECF No. 20), which were referred to United States Magistrate Judge, Lurana S. Snow, for a Report and Recommendation. The motions are fully briefed and an evidentiary hearing on both was conducted on July 27-28, 2017.

The Defendant is charged by indictment with possession of firearms as a convicted felon. In his Motion to Suppress, he seeks to exclude evidence seized from his vehicle following a traffic stop in Key West, Florida on September 13, 2016. The Defendant contends that neither the stop nor the subsequent search of his vehicle was based on probable cause. The Defendant also seeks to suppress statements made by him prior to the administration of <u>Miranda</u> warnings. In its response (ECF No. 41), the Government states that it will not introduce in its case-in-chief any pre-<u>Miranda</u> statements made by the Defendant in response to police questioning, but it does plan to introduce statements made by the Defendant to his father at the scene of the arrest.

In his Motion to Dismiss, the Defendant seeks to dismiss the indictment based on what he characterizes as misleading grand jury testimony by the case agent, Monroe County Sheriff's Office (MCSO) Detective Sergeant Juan Llera.

## I. EVIDENCE PRESENTED

The Government called as its first witness MCSO Deputy John McGee. Deputy McGee testified that he has served as a law enforcement officer with the Florida Highway Patrol, the Key West Police Department and the MCSO since 1986. On September 13, 2016, Deputy McGee was serving on traffic detail as a motorcycle officer. Prior to that date, Deputy McGee's captain had instructed him to contact MCSO Detective Sergeant Juan Llera regarding a special traffic detail. Sergeant Llera assigned Deputy McGee the task of observing the Defendant and, if there was probable cause to do so, conducting a traffic stop of the Defendant's vehicle. Sergeant Llera told Deputy McGee that the Defendant would be driving an F250 truck and directed the deputy to wait in the vicinity of the Defendant's residence. Sergeant Llera did not tell Deputy McGee the reason for conducting the stop, but the deputy assumed it was to look for drugs. Deputy McGee knew the Defendant from two prior traffic incidents, and he was distantly related to the Defendant by marriage.

On the afternoon of September 13, 2016, Deputy McGee waited near the Regal Cinema in Key West until he heard from Sergeant Llera, via radio or cell phone, that the Defendant had left his residence. Deputy McGee proceeded to a location near the Defendant's residence and waited until he saw the Defendant's truck run through a stop sign and stop in the intersection just past the stop sign. As the deputy drew closer to the Defendant, he was able to see that the Defendant was not wearing his seatbelt. When he drew still closer, Deputy McGee could see that the Defendant's seatbelt was buckled behind his back. Deputy McGee decided to stop the Defendant for the seatbelt violation rather than for running the stop sign because the Defendant had stopped in the intersection when no vehicles were approaching.

Deputy McGee activated his lights, but not his siren, and the Defendant pulled over. The deputy did not identify himself to the Defendant because they already were acquainted with one another. He did advise the Defendant that he had been stopped for not wearing his seatbelt, and asked the Defendant to produce his license, registration and proof of insurance. Deputy McGee knew that the Defendant's license at one time had been suspended, but could tell from the license produced by the Defendant that it had been reinstated. At the time of the stop, the Defendant's window was open, and Deputy McGee smelled the odor of green (unburned) marijuana. The deputy explained that he has had training to recognize the smells of green and burned marijuana, and has smelled these odors during the course of his duties as a police officer.

Deputy McGee told the Defendant that he smelled "weed," and this statement was heard by MCSO Detective Iscandel Perez, who was standing nearby. At Detective Perez' suggestion, Deputy McGee instructed the Defendant to get out of the truck. Detective Perez, who had with him his K9 narcotics detection dog, "Deja," then walked around the vehicle with Deja. Deja alerted to the truck, after which detectives on the scene opened up the truck. Deputy McGee observed the Defendant being handcuffed and also saw firearms that had been removed from the truck.

The deputy then identified Government's Exhibit 2, which is the video recorded by his body camera. During the video, Deputy McGee can be heard questioning the Defendant. The video also depicts the Defendant's father, who joined the officers at the scene and told the officers that the firearms found in the truck did not belong to him.

On cross-examination, Deputy McGee testified that he had not known where the Defendant resided until Sergeant Llera provided the address. He stated that Sergeant Llera had not mentioned a confidential informant (CI) or a tip as being the impetus for the planned traffic stop. Deputy McGee also stated that he did not believe Sergeant Llera was aware of the deputy's familiarity with the Defendant; Deputy McGee believed he had been chosen to conduct the stop because it was to occur on his duty shift.

Deputy McGee testified that he had contributed to a supplemental report detailing the traffic stop, but had not communicated with Sergeant Llera or with any of the other officers prior to writing his portion of the report. He also related that prior to writing his portion, he had not reviewed any portions of the report written by other officers. Deputy McGee acknowledged that he had stated in the report that the Defendant was given time to fasten his seatbelt before the stop was conducted. He explained that he always does this prior to stopping anyone for a seatbelt violation. Had the Defendant fastened his seatbelt, Deputy McGee would not have had a reason to make the stop.

Deputy McGee stated that at the time he first spotted the Defendant's truck, he could see that there was only one person inside. He conceded that this could not be seen on the body camera video. He related that when he began his approach to the Defendant on his motorcycle, he was not sure whether he was going to stop the Defendant for running the stop sign or for the seatbelt violation. The deputy did not recall whether he had told Sergeant Llera that the Defendant's license had been suspended, but knew that he could not arrest the Defendant or search his vehicle unless he was certain that the suspension remained in effect.

Deputy McGee acknowledged that Detective Perez joined him within 30-35 seconds of the stop and heard Deputy McGee say that he smelled weed. The Defendant responded by stating "I don't smell weed" or "I don't smoke weed." Deputy McGee admitted that he asked the searching detectives if they had found anything. He explained that he thought there would be drugs inside the truck based on what he had smelled, but wanted to confirm this belief. He went on to state that he was not certain whether the smell had been from the truck or from a someone passing by. For the same reason, Deputy McGee asked whether the dog had alerted on the truck.

Deputy McGee also conceded that he asked about the guns that had been found in the truck and also asked the Defendant whether he was a convicted felon. The deputy acknowledged that the Defendant's statements, characterized as "spontaneous" in his report, were made in response

to his questions before Miranda warnings had been administered. Additionally, the report made no mention of the stop sign violation.

On redirect examination, Deputy McGee stated that he completed his portion of the report on the morning of September 14, 2016, and that he had not reviewed the body camera video prior to doing this. He explained that any variances between his report and the video were not the result of an intent to mislead. Deputy McGee testified that the Defendant never answered his question about whether he was a convicted felon, responding instead that he was dropping off the guns for a buddy who was going hunting in Georgia. Finally, the deputy stated that if he had not observed the Defendant committing a traffic violation, he would not have stopped the truck. He had not been instructed to stop the Defendant regardless of whether an infraction had occurred.

The next Government witness was MCSO Detective Sergeant Juan Llera, who stated that he has been employed with the Sheriff's Office for 15 years, and for the past 4 years he has supervised the Special Operations Unit, which investigates narcotics, money laundering and firearms offenses. Sergeant Llera testified that on September 12, 2016, he received a call from Detective Syracuse of the Key West Police Department (KWPD), who told him that a CI had provided information that the Defendant had firearms that were located in a tool box or tool bag in his truck, and which he was trying to sell in order to support his drug habit. The CI stated that the Defendant, armed with a rifle, had ripped off a drug deal which the CI had brokered. The CI did not want to be identified because she was afraid of the Defendant, as well as the participants in the deal. Detective Syracuse was concerned that the Defendant posed a danger to the safety of the community and asked for Sergeant Llera's assistance.

Sergeant Llera explained that he did not know the identity or track record of the CI, so he needed a plan to determine whether the information was correct. There were three possibilities, the first of which was to involve the CI directly, which was not a good option because of the CI's fears. The second was to conduct a traffic stop, and the third was to keep the Defendant

under surveillance. The sergeant decided on the second option, with the other two as backup plans if the stop did not work out.

Sergeant Llera wanted to utilize a marked KWPD unit to effect the stop, but none was available, so a decision was made for the stop to be conducted by Deputy McGee. The sergeant contacted Deputy McGee and told him where to wait before looking for the Defendant's truck. Additional officers, members of the Special Operations Unit and the KWPD, were stationed in the vicinity in a total of no more than 4 vehicles. Sergeant Llera was in his Dodge truck, parked just behind the place where Deputy McGee later parked his motorcycle, upon learning that the Defendant had left his residence. Another law enforcement vehicle, occupied by Detectives Perez, Brady and Alvarez, was parked on the Defendant's street, three houses from his residence. Sergeant Llera learned via radio that the Defendant had left his residence and was not wearing his seatbelt, and communicated this information to Deputy McGee.

Sergeant Llera testified that as soon as the Defendant's truck reached the intersection, he could see that the Defendant was not wearing his seatbelt. After the Defendant was stopped, Sergeant Llera remained in his vehicle, and Detectives Perez and Brady served as backup to Deputy McGee. The sergeant did not question the Defendant, but did speak to the Defendant's father.

Regarding his grand jury testimony, Sergeant Llera stated that he did not mention the KWPD CI because he had been asked not to do so and because he is very careful about disclosure of CIs, many of whom only provide information and do not actively participate in investigations or testify in court. The Grand Jury was provided with all other pertinent information.

On cross-examination, Sergeant Llera testified that the information he initially provided to Deputy McGee was very general: the Defendant's name, the vehicle he would be driving and the location of his residence. The sergeant did not mention firearms, but said only that there were concerns he was looking into. The sergeant did not know that Deputy McGee was familiar with the Defendant.

Sergeant Llera also stated that the only inquiry he made to the KWPD about the CI was whether the CI would be willing to cooperate by purchasing firearms. Prior to the Defendant's stop and arrest, Sergeant Llera did not know whether the CI had been lying. He did not mention the CI to the Grand Jury, but also did not instruct the other officers to refrain from mentioning the CI in the supplemental report.

Finally, Sergeant Llera testified that he could see from his truck that the Defendant was not wearing a seatbelt "clear as day."

On redirect examination, Sergeant Llera related that he had no knowledge of the CI's reliability. He also stated that the information pertaining to the CI was not needed for a determination of probable cause for the offense with which the Defendant was to be charged, and he had not told the Grand Jury about every fact related to the case. Sergeant Llera stated that when he testified in the Grand Jury about the traffic stop, he meant to convey that the investigation was a joint one, not that it had been solely conducted by the KWPD. During the course of his Grand Jury testimony, he referred to actions by "agents and deputies," which the KWPD does not have. If a grand juror had asked about the information he had received from the KWPD, Sergeant Llera would have answered truthfully.

The Government's next witness was MCSO Detective Iscandel Perez, who testified that he has served as a K9 handler for the past four years. His K9 dog, Deja, is trained to alert to the odor of several drugs, including marijuana, cocaine and MDMA. Detective Perez conducts proficiency training with Deja once per week and Deja is re-certified annually. The dog has performed well and always has been re-certified. She is trained to alert passively, by sitting or lying done when she smells the odor of drugs.

Detective Perez related that on September 13, 2016, he was stationed in a surveillance vehicle with Detectives Alvarez and Brady, about two blocks from the Defendant's residence. As soon as the Defendant drove past his vehicle, Detective Perez followed him. Detective Alvarez told

Detective Perez that the Defendant was not wearing his seatbelt. Detective Perez did not see this because he was driving and focusing on the road.

After Deputy McGee stopped the Defendant's truck, Detective Perez approached the driver's side of the vehicle and heard the deputy say that he smelled marijuana. He then conducted a dog sniff in the manner he always employs, walking counterclockwise around the vehicle. Deja alerted to the driver's door, after which Detective Perez opened the door and allowed the dog to enter the vehicle so that the detective could determine the source of the odor. He stated that Deja alerted to the truck exterior within 20 seconds, and that she does not always alert so quickly. Once inside the truck, Deja alerted to the center console. After the second alert, Detective Perez conducted a manual search of the the vehicle.

Detective Perez stated that the Defendant was handcuffed during the manual search, during which a yellow duffel bag containing firearms was seized. Subsequently, pills were found on the Defendant's person, but Deja is not trained to alert to the substances contained in the pills.

On cross-examination, Detective Perez admitted that he did not smell marijuana on the Defendant or in his truck. He also stated that although he knew from his debriefing that there was a CI involved in the case, he was not instructed to leave this information out of the supplemental report. Detective Perez related that Deputy McGee asked the Defendant to get out of the truck, which is standard procedure when conducting a dog sniff.

Detective Perez stated that before conducting the dog sniff, he leaned into the truck to start the engine so that he could raise the windows. He later opened the door to allow Deja to get inside the vehicle. After concluding the dog sniff, Detective Perez asked the Defendant if he had weed in the truck. No drugs were located during the search, but the tool boxes with the guns were found in a partially open bag in the back of the truck.

On redirect, Detective Perez testified that when he leaned into the truck to start the engine he did not conduct any type of search. He also testified that there have been other occasions

8

when Deja has alerted without drugs being found. He explained that this will occur when drugs which had been present have been removed or when the drugs move out of the vehicle with the suspect.

The Government's final witness was MCSO Detective Joshua Brady, who stated that he has been with the enforcement sections of the Sheriff's Office since 2011 and has been a member of the Special Operations Unit for 10 months. On September 13, 2016, his assignment was that of safety officer. At the time of the stop, Detective Brady approached the Defendant's truck on the passenger side and ensured that the officers and the Defendant were safe. Prior to the stop, the detective was in a surveillance vehicle near the Defendant's residence. As the Defendant drove by, Detective Brady could see that the Defendant was not wearing his seatbelt. At that time, the detective was 10 to 15 feet away from the Defendant. The information he observed was transmitted via radio by Detective Alvarez.

Detective Brady testified that the Defendant's father arrived about 15 minutes after the stop. At that time, the detective was standing next to the Defendant. The Defendant told his father that there were guns in the back of the truck, which he was taking to someone named Danny to go to the hunting cabin. Detective Brady acknowledged that at that time, the Defendant had not been advised of his Miranda rights.

On cross-examination, Detective Brady stated that he believes that mention of a CI had been made during his briefing, but he was not sure what was said. The detective was not told what to include or exclude in his portion of the supplemental report, but explained that he made no reference to the CI because he had not had any contact with the CI. Detective Brady conceded that the Defendant had been conversing with Deputy McGee before being advised of his Miranda rights, and the detective did not stop the Defendant from answering, nor did he administer the Miranda warnings. Detective Brady could not state for certain that the Defendant was directing the statement regarding the guns in the back of the truck to his father.

9

On redirect, Detective Brady stated that the statement in question began with, "Hey Dad," and that the Defendant's face and body were directed toward his father. Thus, to all outward appearance, the Defendant was talking to his father.

The Defendant called as his sole witness private investigator Franklin Cohens, who has had 23 years of law enforcement experience with the United States Coast Guard, the KWPD and the Monroe County State Attorney's Office. After reviewing the video taken by Deputy McGee's body camera, Mr. Cohens took measurements and photographs at the scene of the stop and conducted a re-enactment of the events. He determined that the intersection where Deputy McGee first spotted the Defendant's truck was 122 feet from the location of the deputy's stationary motorcycle.

Mr. Cohens testified at approximately 10:45 a.m. on a date in May 2017, he took photographs of an individual driving a truck similar to that of the Defendant. The individual portraying the Defendant was wearing a lime green shirt similar to the shirt worn by the Defendant on September 13, 2016. The re-enactment consisted of four scenarios: truck windows closed, seatbelt on; windows closed, seatbelt off; windows open, seatbelt on, and windows open, seatbelt off. Mr. Cohen's testimony was documented in Defendant's Exhibits 7, 8, 9 and 10. In none of the photographs taken by Mr. Cohen or in still shots from Deputy McGee's body camera video is it possible to determine whether the driver is wearing a seatbelt.

On cross-examination, Mr. Cohens conceded that the photographs did not duplicate the conditions at the scene at 4:40 p.m. on September 13, 2016. He also testified that he did not observe the driver in the re-enactment from a distance 10 to 15 feet.

Also received in evidence were Government's Exhibit 1, a transcript of Sergeant Llera's Grand Jury testimony; Defendant's Composite Exhibit 2, the MCSO offense report; Defendant's Exhibit 5, excerpts from the video made by Deputy McGee's body camera; Defendant's Exhibit 6, excerpts from the video made by another officer's body camera; Defendant's Exhibit 11, a transcript

of the Defendant's pretrial detention hearing (incorrectly labeled by the court reporter as a telephonic discovery hearing); Defendant's Exhibit 13, an aerial photograph depicting the area of the Defendant's residence and the scene of the traffic stop, and Defendant's Exhibit 14, Mr. Cohen's photo log.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Stop and Search of the Defendant's Truck

The Defendant contends that the stop and subsequent search of his truck was unlawful. He asserts that the testimony of Deputy McGee and Sergeant Llera that they observed the Defendant driving without his seatbelt, and Deputy McGee's testimony that he smelled marijuana at the time of the stop, is not credible. The Defendant also argues that the dog may not have alerted to the truck because the alert cannot be seen on Deputy McGee's body camera video, and that it was unlawful for Detective Perez to open the door to the truck prior to the dog's entry into it. Finally, the Defendant suggests that Detective Perez conducted an unlawful search when he leaned into the truck to start the engine.

A traffic stop is constitutional if it is based on probable cause to believe that a traffic violation has been committed or justified by reasonable suspicion. United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. Whren v. United States, 517 U.S. 806, 813 (1996). Thus, in determining whether a law enforcement officer had probable cause to believe that a traffic violation has occurred, the "officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). Additionally, "[w]here there is at least minimal communication between different officers, the collective knowledge of the officers

determines probable cause." United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992) (citing United States v. Astling, 733 F.2d 1446, 1460 (11th Cir. 1984)).

A brief investigatory stop of a person or vehicle also is permitted where a law enforcement officer has a reasonable suspicion that criminal activity "may be afoot." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The Supreme Court repeatedly has stated that in making reasonable suspicion determinations, reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-418 (1981)). Once a vehicle is lawfully stopped, the detaining officer may order the Defendant to exit the vehicle. Pennsylvania v. Mims, 434 U.S. 106, 109-11 (1977)

In the instant case, both Deputy McGee and Sergeant Llera testified that they clearly could see that the Defendant was not wearing his seatbelt. Additionally, Detective Brady testified that he saw, from a distance of 10 to 15 feet, that the Defendant was not wearing his seatbelt when he drove away from his residence. This information was communicated to Sergeant Llera and Deputy McGee. The undersigned finds the testimony of these witnesses to be credible, despite the fact that Mr. Cohens, during a re-enactment of the stop eight months later at a different time of day, was unable to determine whether the re-enactment driver was wearing a seatbelt. The undersigned also finds the fact that the driver of the depicted trucks cannot be seen either in the photographs taken by Mr. Cohens or the still photographs from Deputy McGee's body camera video is not sufficient to discredit the testimony of Deputy McGee, Sergeant Llera and Detective Brady. Considering all the information available to Deputy McGee, the undersigned finds that he had probable cause to stop the Defendant for a seatbelt violation.

As to the legality of the subsequent search of the Defendant's truck, the smell of drugs by an experienced officer and/or a narcotics detection dog gives rise to probable cause to search the

location of the odor. United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (agent who smelled marijuana had probable cause to search a house); United States v. Brown, 636 Fed.App'x. 514, 417 (11th Cir. 2016) (officer had probable cause to search a car following a canine alert). On this issue, the credibility of Deputy McGee's testimony that he smelled marijuana is more problematic. At the hearing, Deputy McGee testified that he smelled green marijuana, while in his portion of the supplemental report (Defendant's Exhibit 2 at 8), he wrote that he smelled burnt marijuana. Also, on cross-examination, Deputy McGee admitted that he was not sure whether the odor he smelled came from the Defendant's truck or from a passerby. Finally, Detective Perez conceded that he did not smell marijuana outside or inside the truck, and no drugs were found anywhere in the vehicle.

The credibility of Deputy McGee on this issue is not dispositive, since Detective Perez was entitled to conduct the dog sniff regardless of whether anyone smelled marijuana. A drug detection dog may be used to sniff the exterior of a vehicle during a lawful traffic stop without reasonable suspicion of other unlawful activity. Illinois v. Caballes, 543 U.S. 405, 409 (2005). However, the dog sniff must be conducted within the time needed to handle the matter for which the stop was made. Rodriguez v. United States, 135 S.Ct. 1609, 1612 (2015). Here, Detective Perez joined Deputy McGee at the inception of the traffic stop. The dog sniff began as soon as Deputy McGee stated that he smelled marijuana, and the dog alerted to the truck 20 seconds later. There is no question that the dog sniff was conducted within the time required to conduct the traffic stop, and once the dog alerted, there was probable cause to search the truck. Brown, 636 Fed.App'x. at 417.

The undersigned finds Detective Perez' testimony that the dog alerted to the driver's side door of the truck to be fully credible, despite the fact that it is not visible on the body camera videos. Since the dog's alert provided probable cause to search the truck, the actions of Detective Perez leaning into the vehicle to start the engine and power up the windows, and opening the the

door to permit the dog to enter the truck, are immaterial, particularly since neither action resulted in the the discovery or seizure of evidence.

For the foregoing reasons, the undersigned finds that the stop of the Defendant and the subsequent search of his truck were lawful, and the evidence seized from the truck should not be suppressed.

## 2. Statement of the Defendant

The Government concedes that statements made by the Defendant in response to questioning by law enforcement officers prior to the administration of <u>Miranda</u> warnings are inadmissible. The Government seeks to introduce at trial only the statement made by the Defendant to his father to the effect that the Defendant was taking the guns to a friend. The Defendant argues that it is impossible to determine from the body camera videos whether the Defendant was speaking to his father or to the officers. The undersigned finds credible the testimony of Detective Brady that the Defendant was facing his father while making this statement and appeared to be directing the statement towards his father. Additionally, the statement begins, with the words, "Hey Dad." The undersigned concludes that this statement was not made in response to police interrogation, and <u>Miranda</u> warnings were not required. Therefore, the statement is admissible against the Defendant at trial.

## B. <u>Motion to Dismiss</u>

The Defendant contends that Sergeant Llera's Grand Jury testimony contained deliberately false and misleading statements which require dismissal of the Indictment. According to the Motion to Dismiss, Agent Llera's misleading testimony consisted of the following: (1) he told the Grand Jury that he was called by the Key West Police Department to assist on a traffic stop and (2) his testimony, taken as a whole, misled the Grand Jury into believing (a) that this was a random traffic stop and (b) that Agent Llera received a call out of the blue to come to the scene after the Key West Police Department found firearms in the Defendant's vehicle. In the Motion, the Defendant

contends that if the agent had not misled the grand jury, they might have had important questions about whether there was probable cause to make the stop in the first place and whether the searches of the Defendant's vehicle were legitimate. At the hearing, the Defendant focused on the falsity of the testimony, arguing that it constituted egregious Government misconduct requiring dismissal of the Indictment.

It is axiomatic that the exclusionary rule does not require dismissal of an indictment based on evidence obtained unlawfully. As the Supreme Court stated in United States v. Blue, 384 U.S. 251, 255 (1966):

> Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the same ends served by the exclusionary rules, but it would also increase to an intolerable degree interference the public interest in having the guilty brought to book.

Where evidence has been obtained in violation of an accused's constitutional rights, his remedy is suppression of the evidence and its fruits, not dismissal of the indictment. Id.

In United States v. Calandra, 414 U.S. 338, 351-52 (1974), the Court made clear that the exclusionary rule has no application to grand jury proceedings:

> Such an extension would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation. . . . We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury.

Of particular importance in the instant case is the proposition that federal courts will not scrutinize the sufficiency of a prosecutor's presentation on the ground that the presentation was incomplete or misleading. United States v. Williams, 504 U.S. 36, 54 (1992). *See*, *also*, United States v. Kaley, 677 F.3d 1316, 1323-24 (11th Cir. 2012), *aff'd*, 134 S.Ct. 1090 (2014). Based on the function of the grand jury as an independent accusatory body, courts consistently have shown "a

powerful reluctance to allow a pretrial challenge to the *evidentiary* support for an indictment." Kaley, 677 F.3d at 1325 (emphasis in original).

In his Grand Jury testimony, Sergeant Llera testified that in September 2016, he received a phone call from Key West Police Department requesting his assistance on a traffic stop that had been conducted involving a local citizen who was a convicted felon. He further testified that during the course of the stop, two firearms were found in the backseat of the truck. (Government's Exhibit 1 at 3.) At the hearing on the instant motion, Sergeant Llera stated that in this testimony, he meant to convey that there had been a joint investigation with the KWPD, not that he had been called in after the fact. Sergeant Llera also told the Grand Jury that because of a K9 alert, deputies or agents searched the Defendant's vehicle. Id. at 4. In this testimony, Sergeant Llera clearly was referring to MCSO officers because KWPD has neither deputies nor agents.

The undersigned finds that Sergeant Llera's rendition of events, while perhaps inartful, was not a deliberate attempt to mislead the Grand Jury. Moreover, the identity of the agency which effected the traffic stop was completely immaterial to the Grand Jury's determination of whether there was probable cause to believe that the Defendant possessed firearms as a convicted felon. Therefore, there was no misconduct justifying dismissal of the Indictment against the Defendant.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that:

1. Defendant, Nelson Atwood Sawyer's Motion to Suppress Physical Evidence Related to the Traffic Stop Giving Rise to Mr. Sawyer's Arrest and Indictment Herein, as well as Mr. Sawyer's Unmirandized Statements Made After Being Placed in Custody During the Same Traffic Stop (ECF No. 21) be DENIED, and

2. Defendant, Nelson Atwood Sawyer's Motion to Dismiss the Indictment [D.E. 1] on Grounds of Government Misconduct (ECF No. 20) be DENIED.

Failure to file objections shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and Recommendation, and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

DONE AND SUBMITTED at Key West, Florida, this 31st day of July, 2017.

*[signature]*
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

SAUSA Mark Wilson (KW)
Roger Cabrera, Esq.